UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> DAVID GERARDO VIDAL-PINA, | Crim. No. 07-854 (KSH) <br><br> **OPINION** |

**Katharine S. Hayden, U.S.D.J.**

This ruling resolves the constitutional challenge raised by defendant David Vidal-Pina to the validity of the search of his truck outside a Wal-Mart store on August 20, 2007. The Court has held a hearing at which law enforcement officials, two state and one federal, gave testimony. Mr. Vidal-Pina did not testify. He argues that the consent-to-search form he signed was invalid because he did not understand the language in which it was written, rendering his consent involuntary and the subsequent search of his vehicle constitutionally deficient. In reviewing Vidal-Pina's constitutional attack, the Court is guided by the Supreme Court's seminal decision in Schneckloth v. Bustamonte, 412 U.S. 218 (1973), which held that

> When . . . the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. <u>Voluntariness is a question of fact to be determined from all the circumstances.</u>

412 U.S. at 248-49 (emphasis added). The circumstances of this case mandate that Vidal-Pina's motion to suppress be granted.

1

According to the government witnesses, defendant, who is 40 years old and a citizen of Mexico, is in the business of buying automobile parts in the United States at auctions, bringing the parts back to Mexico to his shop where he uses them to fix and refurbish older cars, and then sell (or more precisely, re-sell) the finished product. (Tr. 2-49; Gov't Br. p. 2.)[1]

On August 20, 2007, sometime before 4:30 pm, Vidal-Pina was at the Wal-Mart purchasing items at the check-out register with a $100 bill. A store employee contacted the Linden police because she suspected that the bill was counterfeit. She told Officer James Maroney, the government's first witness, that Vidal-Pina had been told that there was a problem of some sort, and the bill he was using was no good. (Tr. 1-11.) When Officer Maroney arrived, Vidal-Pina was "at the register. He was looking to check out." No one was holding him in custody or physically restraining him. (Tr. 1-12.) Maroney, who had been given the suspect $100 bill, approached Vidal-Pina and held the bill in his hand "and I physically put it up to him and explained to him I said, this bill is no good, it is no good, it's counterfeit, and I didn't get a response at all." (Tr. 1-13.) When asked if Vidal-Pina responded non-verbally, Maroney testified: "He attempted to produce another $100 bill. And physically handed me another $100 bill." (Tr. 1-13.)

> Q. And after that what happened then?
>
> A. I said this is not where I'm going with this. I need some identification. I need to, you know, find out, you know, I need something more. He wasn't answering me at all. He appeared to be like, just like confused of some sort. I mean, I was trying to make it very clear to him that that's fine, you may have another bill, but that is not going to help us right now. Give me some identification. I need to make a report at minimum that you're attempting to pass a bill that they say is counterfeit.

---

[1] All references to "Tr. 1" refer to the hearing held on January 31, 2008. All references to "Tr. 2" refer to the hearing held on March 14, 2008.

2

So Maroney directed Vidal-Pina to the security area of the store to a small office behind the Customer Service section. He did not have his weapon drawn or attempt to restrain Vidal-Pina. He began to question Vidal-Pina for identification purposes. "The basic question is what is your name. I didn't get a response." (Tr. 1-15.)

Maroney does not speak Spanish, which is Vidal-Pina's native language. When Maroney was asked about Vidal-Pina's general demeanor during the questioning, he testified: "He appeared to be very calm. Little nervous. He appeared to be sweating. My initial observation was I thought he had had a few drinks, but as far as intoxicated fall down, not at all. I didn't really smell an odor that was concerning me at all.[2] But just quiet – very quiet and calm." (Tr. 1-18.) "He was very he was – he was looking right at me and he was just very quizzical almost like, like he wanted to tell me more but he wasn't saying anything." (Tr. 1-18.)

Not getting any further, Maroney called his supervisor at headquarters and, as a result of that conversation, Maroney said, "I continued again. I tried to get some concrete identification from him. I wanted to confirm who he was either through a SS or a driver's license of some sort; so I could make my report and basically send him on his way." (Tr. 1-20.) Maroney testified that "the most important thing to me was to be getting a name, date of birth, Social Security number." His report reflected that "all he did was shrug his shoulders and say, no understand, no English." (Tr. 1-35.)

---

[2] When he was cross-examined, Maroney testified that he ultimately concluded that Vidal-Pina was not intoxicated. He repeated that Vidal-Pina was sweaty, but that it was hot inside the area of the Wal-Mart and it was August. (Tr. 1-34.)

3

Vidal-Pina, remaining calm,[3] provided no further information than this. (Tr. 1-20.) When Maroney decided to take Vidal-Pina from the cash register area to the security office, he did not conduct a search of Vidal-Pina. (Tr. 1-36.) He continued to try to question Vidal-Pina but because he had no Spanish, he got no more than one-word answers. (Tr. 1-37.) A store employee who speaks Spanish was summoned to assist, and while he spoke to Vidal-Pina, Maroney "backed off. I don't understand Spanish. I assumed if anything relevant came out of the conversation they would let me know." (Tr. 1-38.) Ultimately, Maroney "was given a name." Maroney asked Vidal-Pina to empty his pockets. There were two keys, one clearly marked as a Ford key. (Tr. 1-16.) At one point, Vidal-Pina gave Maroney a document, Gov't Exh. D, that appeared to Maroney to be a registration with a vehicle identification number ("VIN") number related to a Ford vehicle. (Tr. 1-19.)

On cross-examination, Maroney gave further details about his interaction with Vidal-Pina. After he got Vidal-Pina's name, he couldn't confirm anything.

> Q. But you at least, while in the room you did finally find out what his name was and where he came from?
>
> A. I was given a name, you know, is that his real name and I couldn't confirm anything.
>
> Q. And then at that point, well, if I may. You did describe to the prosecutor though that his demeanor in the room there seems to be rather he was quiet and calm you described him as?
>
> A. Yes. Yes. I got the impression that he understood me, but if the guy doesn't want to talk to me I can't force him to talk to me.
>
> Q. What made you think that he understood you?

---

[3] On redirect, Maroney was referred to the incident report that he prepared later that evening and filed the next morning. (Tr. 1-49.) In the report, he described Vidal-Pina as appearing "extremely nervous, sweating and shaking" while he was in the area of the cash register. This is at odds with his consistent live testimony that Vidal-Pina was calm.

4

A. Well, he was looking right at me, listening to me. I don't know. I was on the fence whether he understood me or not, honestly, I couldn't tell one way or the other.

Q. Well, mainly you believed he was understanding you by the fact that he was like looking straight at you?

A. Yeah. Or like, I don't understand, I didn't understand what he thought was going to happen here. I don't know whether he thought we were just going to let him walk out. I tried to explain to him that, if you don't provide positive identification you can't leave. Now did he understand me? I don't know.

Q. Were you going to let him go if he gave you identification even though he had apparently just passed a counterfeit $100 bill?

A. He would have went on his way, he would have, if he had provided positive identification, I would have made my report. If he would have acknowledged that he didn't know how he got the bill, of course, that's our policy we make a report and our detectives will try to follow it up with him at some point.

Q. But you also explained to the prosecutor that he continued to look quizzical in that room, right?

A. I described it as quizzical. Quizzical, yes. That would be my description of it, yeah.

Q. And so there came a time that you decided that may be you got to take this down to headquarters, right? I think that was after a phone call you made to headquarters?

A. That was after two phone calls. I made a second phone call.

Q. So that decision was not made by you that was made by somebody else in headquarters to tell them to bring him down?

A. Yes.

Q. And obviously, while still in the room, you did in essence place him under arrest formally by handcuffing him in the back.

A. Yes, he was placed under arrest prior.

Q. And while back in that security office after you placed him under arrest, did you actually formally say, you are under arrest to him?

A. I don't recall if I did or not. I explained to him, put your arms behind your back. I may have physically grabbed one of his arms—I don't recall. I've made a lot of arrests before. It was evident that he was under arrest. I normally do that, yeah.

5

> Q. And obviously, you—do you understand how to say that in Spanish, you're under arrest?
>
> A. No, I do not.
>
> Q. So you probably would have said that in English, right?
>
> A. Yes.
>
> Q. Did you ask the Spanish-speaking Wal-Mart employee to tell him that he's under arrest to do that in Spanish?
>
> A. I don't recall doing that. I don't believe I would have.
>
> Q. Did you try for what it's worth any how to explain to him his Miranda rights so that he didn't have to speak to you at that point?
>
> A. No, I wasn't going to question him any further. No.
>
> Q. I'm not saying when you were going to question any further. My question to you is did you advise him of his rights under Miranda that he had a right to remain silent and things as to following his Miranda warnings?
>
> A. No, I did not.
>
> Q. You did not tell him that in Spanish or in English after—at the security headquarters, right?
>
> A. No.

(Tr. 1-39-42.)

At headquarters, Sergeant William Turbett, who speaks some Spanish and could assist in the questioning, was waiting. Maroney conferred with another officer, who phoned the Secret Service. At some point during the interaction with Turbett, Maroney testified that Vidal-Pina signed a consent-to-search form, and after Maroney learned that Vidal-Pina's truck had been located in the Wal-Mart parking lot, he went there to conduct a search of it. Maroney testified that at the point where Vidal-Pina signed the consent-to-search form, Turbett was speaking to

6

him in English. (Tr. 1-45.) He stated that he could not recall whether Turbett advised Vidal-Pina that Vidal-Pina did not have to consent to the search, or that he had the right to be present during the search. (Tr. 1-47 to 48.)

William Turbett, the second government witness, is a patrol sergeant with the Linden police department. When asked on direct if he is fluent in Spanish, he answered, "No, not at all." (Tr. 1-53.) "I can help somebody in an emergency situation. . . . I'm not an expert in the language or fluent at all." (Tr. 1-53.)[4] He had been alerted that afternoon that Officer Maroney had arrested a person who did not speak English, and he was asked to meet Maroney and try to assist him to get information from the person. Turbett asked Vidal-Pina in Spanish for his name, date of birth, what kind of work he did, what he was doing at the Wal-Mart. He gave an address. As Turbett got into the details of Vidal-Pina's work, Vidal-Pina began to answer in English. (Tr. 1-58.) "[M]y extent of Spanish doesn't include what I was asking what he was doing in the area as far as like he was buying motorcycle parts for his business or how he had traveled through the country doing this." As far as comprehending and speaking on this subject, Vidal-Pina "could understand what we were asking him." (Tr. 1-59.)

Turbett testified that he asked Vidal-Pina how he got to the Wal-Mart, and Vidal-Pina replied that he had driven there and he had a red Ford pickup truck. He could not recall what language Vidal-Pina was speaking then. He asked Vidal-Pina where his identification was, and Vidal-Pina told him that he had a passport and a visa that were in the truck. (Tr. 1-60.) Turbett

---

[4] When Maroney testified, he told the Court that Sergeant Turbett speaks Spanish.
    Q. And how are you aware that he speaks Spanish?
    A. He's my sergeant and I know he's fluent in Spanish.
    Q. He's fluent in Spanish?
    A. Yes.
Tr. 1-43.

7

asked Vidal-Pina if he could search the truck at that point, in English. He said that Vidal-Pina responded, "Sure," in English. After identifying Gov't Exh. E as the Police Department of Linden, New Jersey Permission to Search form, Turbett described how Vidal-Pina was shown and signed it.

"I explained to Mr. Vidal-Pina that he had given me permission to search his vehicle. And I told him in – for Linden we have to fill out this particular form, it is a written document in order to get permission to search his vehicle. I filled it out with the information that we had on his vehicle and where he told us where his car was in the Wal-Mart parking lot...." Turbett was speaking in English. (Tr. 1-62.)

"He just – we were just having a conversation and when I was telling him in English, this is the form that would give us permission to search his vehicle. And I had just explained to him in English exactly what was filled out and the description of the vehicle. And that if he signed this it would give us permission to search his vehicle at that time." (Tr. 1-62.)

> Q. How did Mr. Vidal-Pina, in your mind, indicate to you that he understood the permission to consent form?
>
> A. I asked him after I explained what it was, I asked him to read it and then I asked him if he understood that and if he'd give us permission to sign it on the bottom.
>
> Q. Did Mr. Vidal-Pina indicate to you that he did read the form with you?
>
> A. He told me that he understood it.
>
> Q. When he told you that he understood it was that in English or in Spanish?
>
> A. In English.

(Tr. 1-63-64.) After getting the signature, Turbett radioed out to an officer working in the area of the Wal-Mart to locate the truck. Turbett and Maroney went out to the vehicle, which was located 100 yards from the main entrance of the Wal-Mart parking lot.

8

Sergeant Turbett's testimony was not concluded on the first day of the hearing. When the proceedings resumed, the prosecutor asked Turbett if he had asked Vidal-Pina whether he could speak, read and write the English language. He confirmed that he did ask that question, in English. (Tr. 2-4.) And he testified that Vidal-Pina answered it affirmatively, also in English. (Tr. 2-4.) In his earlier testimony, Turbett said that when he began questioning Vidal-Pina, he started in Spanish, and they were going back and forth in Spanish and a little English, and that he was not able to ask more intricate questions about what work Vidal-Pina was engaged in because of his limited Spanish. (Tr. 1-57 and 59.) On cross-examination, Turbett explained:

> Q. [A]t some point the conversation left from the Spanish language to the English language, correct?
>
> A. Correct.
>
> Q. And unlike Officer Maroney's experience, you were able to speak to him in English, correct?
>
> A. That's correct.

Asked if Vidal-Pina had "at best broken English," Turbett hedged. "Well, I would say he spoke a little bit better than broken English." But in response to whether he was able to converse without any problem, he replied that "both of us were going back and forth a little bit of English and a little Spanish." (Tr. 2-19.)

Turbett indicated that the Linden police have Miranda forms in Spanish, but the consent-to-search forms are all in English. (Tr. 2-16.) He testified that he did not read the form to Vidal-Pina. (Tr. 2-21.)

> Q. Did you actually read that for him or did you just hand it to him and tell him, why don't you read it?
>
> A. What I did was when we were speaking I asked him if it was alright to search his vehicle he said yes. I told him that we have a form that we have a consent to search

9

> form that we would like to have him sign. . . . I told him that this would give us permission to go and search his vehicle. And that if he wanted, he didn't have to let us go and search it. Also if he wanted to be there with us he could also go with us also. And I asked him if he understood this. I gave him the piece of paper. He was standing – we have a table there. He was standing there, I believe reading through this. And told him if he understood it. Would he please sign it where I had the X on the paper.
>
> Q. Did you write out his name?
>
> A. Yes, sir. I wrote that, yes, sir.
>
> Q. Okay. And how do you know that he understood exactly what was contained in that document?
>
> A. Through my conversation with him.
>
> Q. You mean after you said all of those things that you just repeated to us here in court, you said do you understand, and then what did he do? Did he not yes? Or say the word yes or did he just sign the document?
>
> A. I don't know whether he stated, ye – nodded or whatever. I know I asked him if he did understand it though.

(Tr. 2-22.)

Turbett did not tell Vidal-Pina why he wanted to search the truck. He did not give him the reason testified to by Maroney, that the reason the police wanted to get into the car was to get Vidal-Pina's identification papers. He did agree, "That could be one of the reasons, sure."

> Q. Do you remember telling him that as the reason?
>
> A. No.
>
> Q. In fact, your testimony is that you never gave him any indication as to exactly what the reason was?
>
> A. I told him that we were going to search the vehicle.
>
> Q. But my question is, did you tell him the reason why you wanted to search the vehicle?
>
> A. No, I didn't.

10

(Tr. 2-23.) Turbett asserted that he specifically told Vidal-Pina that he had a right to refuse – in English. (Tr. 2-24.) Asked if Vidal-Pina gave him any problems at all while he was down at headquarters, Turbett responded, "Absolutely not. He was a gentleman the whole time." (Tr. 2-26.)

Agent Kevin Song of the United States Secret Service was the final witness. On August 20, 2007 he received a late phone call and responded to the arrest of Vidal-Pina. (Tr. 2-31.) He arrived at the Linden Police Department about 7:30 p.m. and he spoke to Officer Maroney and Sergeant Turbett. (Tr. 2-33.) He reviewed documents that had been recovered from Vidal-Pina's truck, and came in contact with him about 9:15 p.m. (Tr. 2-33.) Agent Song had forms with him. He started with the personal history form. (Tr. 2-34.) He testified that he was speaking English and that he has no ability to speak Spanish. (Tr. 2-36.) He never spoke to Vidal-Pina in Spanish. No one was translating for him. At no time during the personal history questions did Vidal-Pina ask for a Spanish translation. (Tr. 2-39.)

The next form Agent Song used was the Miranda form, Gov't Exh. G. (Tr. 2-40.) He moved his chair so that he and Vidal-Pina were sitting catty-corner and looking at the form together. Present during this questioning process was Officer Angel Padilla of the Linden police, who is fluent in Spanish. (Tr. 2-41.) According to Song, Padilla was in the room with Vidal-Pina and himself in the beginning, then he would walk in the hallway and walk back in and at times hang out at the door. (Tr. 2-42.)

The Miranda form had text in both English and Spanish. Song testified that he read each line and then asked Vidal-Pina if he understood, and Vidal-Pina responded with a mix of nods and yeses. (Tr. 2-43.) Song gave Vidal-Pina the form and he looked at it for a few seconds and put the form back down on the table, and Song told him to check "yes" if he understood the

11

rights described. He marked the box beside the word "Si" on the Spanish side of the form. (Tr. 2-47 and 61.)

After that, Song began to question Vidal-Pina, and stated that Vidal-Pina responded to questions about his work in automotive repair, telling him where he had traveled. Vidal-Pina told Song he had graduated from high school in Mexico. He asked Vidal-Pina what the counterfeit money that had been seized from his truck was doing there. (Tr. 2-49.) At that point, Song testified that "He just looked confused and he said, ah – he didn't know what to say he was kind of blank in the face." He then said he had received the money from a place in Mexico. When Song pressed for details, Vidal-Pina looked over at Officer Padilla, and Song told Padilla to ask the same question in Spanish. Vidal-Pina gave the same vague response in Spanish, according to what Padilla told Song. (Tr. 2-50.)

Song testified that Vidal-Pina answered the pedigree questions he posed without any resistance. (Tr. 2-57.) After completing the Miranda form and getting Vidal-Pina's signature, Song's police report indicates that Vidal-Pina began getting a little vague and that he wanted a translation. (Tr. 2-63.) Song's report indicates that after he asked Vidal-Pina why he was using counterfeit money, Vidal-Pina said he didn't believe he was doing anything wrong and that he was not in any trouble at all. (Tr. 2-67.) When asked on cross-examination if Vidal-Pina ever admitted that he knew when he was at the Wal-Mart, or prior to that, that the money he had in his possession was counterfeit, Song said that Vidal-Pina "looks at me like there's nothing wrong with that." Pressed to explain, Song testified that he could not remember what Vidal-Pina said at that point.

At the end of his testimony, the Court asked Agent Song if he concluded after Vidal-Pina signed the Miranda form that Vidal-Pina is literate in Spanish and he responded that there was no

way for him to know if he could read Spanish or not – he only knew that Vidal-Pina chose to sign on the Spanish side of the form. He said he did not know if Vidal-Pina understood the written Spanish. (Tr. 2-71.) He stated he was not relying on Vidal-Pina's having the Spanish translation of the Miranda form in assessing whether or not he understood what Song was saying to him when they were going over it. (Tr. 2-72.)

This contrasts with Sergeant Turbett's testimony that he watched Vidal-Pina as he looked at the consent-to-search form. "I gave him the piece of paper. He was standing – we have a table there. He was standing there, I believe reading through this. And told him if he understood it, would he please sign it where I had the X on the paper." (Tr. 2-21.) Turbett was reassured by Vidal-Pina's apparently reading an all-English consent form and signing it, after Turbett admitted he hadn't read the form line for line to him in any language.

The Linden police testimony establishes that Vidal-Pina was unable to communicate successfully with Maroney while at the Wal-Mart, and this led to his arrest and appearance shortly afterwards at police headquarters for further questioning by another officer, versed enough in Spanish to assist in emergency situations, but admittedly not fluent and unable to communicate in Spanish beyond basic pedigree questions. The police testimony confirms that an Officer Padilla, who was fluent in Spanish, eventually arrived at headquarters and was sent to assist Agent Song. By that time the search had been conducted. The police testimony is in conflict insofar as Maroney testified that Turbett is fluent in Spanish, which Turbett denies. The testimony reveals that the request to search Vidal-Pina's truck was made verbally, in English, and that the information that he could refuse the search and be present at the search was provided to him in English. The police testimony establishes that Vidal-Pina's truck key was taken from him at the Wal-Mart store, along with the truck registration document. The police testimony also

13

establishes that when he was told by Officer Maroney, the first responder, that the $100 bill Vidal-Pina had used to pay for his purchases was no good, Vidal-Pina immediately produced another $100 bill, and that he was cooperative throughout the questioning. The only time that Vidal-Pina was not forthcoming, according to all the witnesses, was after Agent Song's question (posed to him in Spanish by Officer Padilla) regarding why there were counterfeit bills in his car, whereupon he stated he had done nothing wrong. This was the only moment when questions of substance beyond basic pedigree inquiries were posed to him in his native language. By that time, his truck had already been searched and he had been in custody for several hours.

The police testimony also reveals that if Vidal-Pina had provided identification documents to Maroney at the Wal-Mart, documents that apparently were outside in his truck, Maroney was inclined to release him. Maroney did not explicitly say that he told Vidal-Pina that all he was looking for was confirmation of the basic pedigree information of his name that the Spanish-speaking employee of Wal-Mart had elicited from him. Nor did he testify that he did not tell that to Vidal-Pina. This leaves the Court with a basic, haunting question: Why, if Vidal-Pina understood English well enough to understand what he was doing when he signed the consent-to-search form at police HQ, didn't he tell Maroney at the Wal-Mart store that his documents were in his truck and ask permission to fetch them? Clearly Maroney was working doggedly to get through to Vidal-Pina. It makes very little sense that Vidal-Pina had a working command of English and yet, for no fathomable reason, withheld information that could have quickly secured his release.

Nor is the Court convinced that Agent Song's apparent success in getting through to Vidal-Pina reflects that he had understood enough English to have knowingly signed the consent-to-search form and to have given permission to search the truck even though no one

gave him any reason why the search was being conducted. From the first moments of Song's questioning, Officer Padilla was present. By that time, Vidal-Pina had been at headquarters for over four hours. Officer Padilla is the only officer fluent in Spanish attached to headquarters. Yet Song testified that Officer Padilla barely posed any questions, and when he finally did, it was in response to Vidal-Pina's request for a translation. This apparent anomaly may be explained by the content of the questions. Vidal-Pina could give pedigree information and some details about his work, but when the more intricate questions came up, he foundered. After all, Song and Turbett testified consistently about how Vidal-Pina was able to follow questions about who he was and what he did; moreover, basic pedigree information of a sort was elicited by the Spanish-speaking Wal-Mart employee. Seen as a whole, the testimony of all three witnesses demonstrates that, once prompted by that employee, Vidal-Pina gave pedigree and work-related information in English. But without assistance from Padilla, he looked confused and quizzical and was unresponsive.

How, then, does the Court reconcile the foregoing with Sergeant Turbett's testimony about the circumstances surrounding the permission to search? Apparently Turbett, for all his emergency assistance, did not know the Spanish word for "consent" or "search." He was specific that he did not read the contents of the consent-to-search form to Vidal-Pina line by line. It appears instead that Turbett posed the question about searching the truck in English, got an affirmative answer from Vidal-Pina, and then presented the form, watched Vidal-Pina look at it, accepted that he was reading it, and then took Vidal-Pina's signature above where he had written Vidal-Pina's name. On those facts, Vidal-Pina could just as easily have been signing a form he thought would give the police permission to drive the car back to headquarters.

15

Hovering over Turbett and Vidal-Pina's interactions is the fact that the Linden police knew that Officer Padilla, who was fluent in Spanish and easily communicated with Vidal-Pina when he arrived, was due to get to headquarters at some point in the evening. Maroney's shift was over at 5:15 p.m., Tr. 1-9, and Sergeant Turbett was working the day shift that began at 7:00 a.m. and ended at 5:45 p.m., Tr. 1-54, minutes after Vidal-Pina arrived at headquarters. Other than convenience, there was no reason to engage in a conversation that was aimed at securing consent to search Vidal-Pina's truck. Maroney and Turbett gave no reason for the search to Vidal-Pina, either to Vidal-Pina himself or the Court, other than Maroney's testimony that he learned while he was at the Wal-Mart that identification documents were located in Vidal-Pina's truck. Vidal-Pina had not even been Mirandized when Turbett asked him in English if he would consent to a search of the truck. This bad timing is particularly disturbing when Turbett admitted his Spanish was definitely not fluent, and Maroney was describing Vidal-Pina as looking "confused," "quizzical," and so uncomprehending that not only did Maroney find it impossible to make Vidal-Pina understand how close he was to being released when he was questioning him at the Wal-Mart—Vidal-Pina was so uncomprehending that he offered Maroney another $100 bill.

The government's theory is that Vidal-Pina was calculating and deceptive and that his answers about his work demonstrate proficiency in English that corroborates the officers' testimony that he understood the contents of the consent-to-search form and the verbal request to search the truck. But this simply doesn't square with Maroney's testimony that he was prepared to let Vidal-Pina go; it doesn't square with the testimony that reveals, when taken as a whole, that Vidal-Pina initially communicated with a store employee and apparently got the gist of the pedigree information Maroney wanted, had enough business dealings in this country to describe

16

what he does for a living, and never went any further in his communications without assistance. The inconsistencies to be found do not relate to Vidal-Pina's conduct, but rather to the witnesses, who are at some odds about how much Spanish Turbett knew, or what precise answers Vidal-Pina gave to potentially explosive questions like "[w]hat were those counterfeit bills doing in your car?"; or why someone who knew he had identification documents in his car that could clear up Maroney's dilemma knowingly remained silent about them, and then knowingly permitted police to search the truck for anything they could find in it, including contraband that he knew was there.

In United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003), the Third Circuit reasserted its analysis in United States ex rel. Harris v. Hendricks, 423 F.2d 1096 (3d Cir. 1970), where the Court gave its interpretation of the "totality of the circumstances" text set down by the United States Supreme Court in Schneckloth v. Bustamonte, 412 U.S. 218 (1973). According to Harris v. Hendricks:

> It is settled that "the existence and voluntariness of a consent is a question of fact", to be decided in the light of the attendant circumstances by the trier of facts. Critical factors of attendant circumstances include the setting in which the consent was obtained, *what was said and done by the parties present with particular emphasis on what was said by the individual consenting to the search*, and his age, intelligence and educational background.

423 F.2d at 1099 (emphasis added).

The problem here is that no witness has testified about what was said by Vidal-Pina beyond one word assents to the critical question of consent to search the vehicle and his signature on a form that was not specifically read to him. The witnesses testified instead to what they said, and have not convinced this Court that this witness understood them, based on their

own consistent descriptions of his conduct and demeanor. Put another way, what Vidal-Pina did and how he appeared do not square with that to which he purportedly consented. This warrantless search, conducted for no exigent reason and in the absence of exigent circumstances, required a clear expression of consent, which Sergeant Turbett's testimony fails to describe and Officer Maroney's testimony does not support. As counsel for Vidal-Pina has argued, "Mr. Vidal-Pina is interrogated at the Wal-Mart store and then later at Linden Police headquarters. He is never advised of any constitutional rights under Miranda by the Linden police officers. Officer Maroney has no recollection of hearing Sergeant Turbett advise Mr. Vidal-Pina that he did not have to consent to the search or that he could be present during the search. Sergeant Turbett admitted that he did not read the consent form word for word . . . and has no specific recollection as to how Mr. Vidal-Pina acknowledged understanding his rights."

The Court understands that the failure to give a Miranda warning is not fatal. But the absence of this type of information and the ambiguity between the police testimony about whether Sergeant Turbett told Vidal-Pina in English about his right to refuse and his right to be present, amounts to a context that is, if not coercive, strongly suggestive of insufficiency of proof that Vidal-Pina gave "unequivocal and intelligent consent" to the search of his truck. In United States v. Sanchez, 89 F. 3d 715, 719 (10th Cir. 1996), the court set forth a two-part test for voluntariness: the consent must be unequivocal, specific and freely and intelligently given; and it must be given without implied or express duress or coercion. Applying these factors, the Court concludes that the government's proofs fail. Sanchez frames the defendant-related and interaction-related factors identified by the Third Circuit in Harris and its progeny and, as such, is not a more demanding analysis. Indeed, as the Court's lengthy review of the record demonstrates, it is Schneckloth that takes the prize for demanding tests, requiring a close look at

18

everything. Viewed thus, it becomes apparent that the government's proofs are notable for what they did not adduce: evidence that the defendant himself, verbally – since it is the government's theory that he spoke English sufficiently to understand the police – consented knowingly and unequivocally to a search of his truck for anything that was in it. The proofs are equivocal about what Vidal-Pina understood or what he said at crucial moments. The one sure way to demonstrate that he understood the import of the consent-to-search form would be evidence that he could read and understand the English text. And there is absolutely no proof that he could and proof galore that he could not.

Vidal-Pina's motion is granted. The government and defense counsel shall advise the Court promptly regarding the status of these proceedings in light of the pending trial date.

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.